# EXHIBIT A

*Served personally*
*8/10/23*

## COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23001531-00

WASHINGTON ................................................................................................................ Circuit Court

189 EAST MAIN STREET, ABINGDON 24210-
ADDRESS

TO:

EMORY AND HENRY COLLEGE, MARK R. GRAHAM

30461 GARNAND DRIVE

EMORY, VA 24327-2500

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

AUGUST 1, 2023 ..................................     MOORE, PATRICIA S. _____ Clerk
DATE

by  /S/ MCCRACKEN, BARBARA _____
DEPUTY CLERK

Instructions:

Hearing Official: ........................................................................................................

FORM CC-1400 MASTER 10/13

# EXHIBIT A

Uploaded: 2023JUL31 16:30 Filed By:SFAIRCLOTH on behalf of Bar# 97439 BNORTH Reference: EF-127216
E-Filed: 2023JUL31 WASHINGTON CC BMCCRACKEN at 2023AUG01 09:17 CL23001531-00

**COVER SHEET FOR FILING CIVIL ACTIONS**     Case No. ................................................

COMMONWEALTH OF VIRGINIA                                    (CLERK'S OFFICE USE ONLY)

........................ WASHINGTON COUNTY ........................ Circuit Court

.......... DOE, JOHN .......... v./*In re:* ........ EMORY AND HENRY COLLEGE ..........
PLAINTIFF(S)                                              DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**

**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [ ] Product Liability
- [ ] Wrongful Death
- [X] Other General Tort Liability

**ADMINISTRATIVE LAW**
- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

**WRITS**
- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

**PROBATE/WILLS AND TRUSTS**
- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

**MISCELLANEOUS**
- [ ] Amend Birth/Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

[X] Damages in the amount of $ __1,000,000.00__ ........................ are claimed.

| | |
|---|---|
| __7/31/2023__ | */s/ Benjamin North* |
| DATE | [ ] PLAINTIFF  [ ] DEFENDANT  [X] ATTORNEY FOR  [X] PLAINTIFF [ ] DEFENDANT |
| __Benjamin F. North__ | |
| PRINT NAME | |
| __Binnall Law Group, 717 King Street, Ste 100,__ | |
| ADDRESS/TELEPHONE NUMBER OF SIGNATOR | |
| __Alexandria, VA 22314; (703) 888-1943__ | |
| __ben@binnall.com__ | |
| EMAIL ADDRESS OF SIGNATOR (OPTIONAL) | |

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 02/23

# EXHIBIT A

## Civil Action Type Codes
### (Clerk's Office Use Only)

Accounting ................................................. ACCT
Adoption .................................................... ADOP
Adoption – Foreign ..................................... FORA
Adult Protection ......................................... PROT
Aid and Guidance ........................................ AID
Amend Birth/Death Certificate ...................... AVR
Annexation ................................................ ANEX
Annulment ................................................ ANUL
Annulment – Counterclaim/Responsive Pleading .. ACRP
Appeal/Judicial Review
   ABC Board .............................................. ABC
   Board of Zoning ..................................... ZONE
   Compensation Board .............................. ACOM
   DMV License Suspension ............................. JR
   Employment Commission ......................... EMP
   Employment Grievance Decision .................. GRV
   Local Government ................................. GOVT
   Marine Resources .................................. MAR
   School Board ............................................ JR
   Voter Registration ................................. AVOT
   Other Administrative Appeal ..................... AAPL
Appointment
   Conservator of Peace ................................ COP
   Church Trustee ..................................... AOCT
   Custodian/Successor Custodian (UTMA) ..... UTMA
   Guardian/Conservator ............................. APPT
   Marriage Celebrant ............................... ROMC
   Standby Guardian/Conservator .................. STND
Approval of Transfer of Structured Settlement ............ SS
Asbestos Litigation ......................................... AL
Attachment ................................................. ATT
Bond Forfeiture Appeal ................................. BFA
Child Abuse and Neglect – Unfounded Complaint .. CAN
Civil Contempt ......................................... CCON
Claim Impleading Third Party Defendant –
   Monetary Damages/No Monetary Damages .......... CTP
Complaint – (Miscellaneous) ........................ COM
Compromise Settlement ............................. COMP
Condemnation .......................................... COND
Confessed Judgment ...................................... CJ
Contract Action ....................................... CNTR
Contract Specific Performance ...................... PERF
Counterclaim – Monetary Damages/No Monetary
   Damages ................................................ CC
Cross Claim ............................................ CROS
Declaratory Judgment ................................ DECL
Declare Death .......................................... DDTH
Detinue .................................................... DET
Divorce
   Complaint – Contested/Uncontested ............... DIV
   Counterclaim/Responsive Pleading ............... DCRP
   Reinstatement – Custody/Visitation/Support/
      Equitable Distribution ........................... CVS
Driving Privileges
   Reinstatement pursuant to § 46.2-427 ............. DRIV
   Restoration – 3rd Offense .......................... REST

Ejectment ................................................ EJET
Encumber/Sell Real Estate ............................... RE
Enforce Vendor's Lien ................................. VEND
Escheatment ............................................. ESC
Establish Boundaries .................................. ESTB
Expungement ........................................... XPUN
Forfeiture of Property or Money .................... FORF
Freedom of Information ................................ FOI
Garnishment .......................................... GARN
Injunction ................................................. INJ
Intentional Tort ....................................... ITOR
Interdiction ............................................. INTD
Interpleader ............................................ INTP
Interrogatory .......................................... INTR
Judgment Lien – Bill to Enforce .................... LIEN
Landlord/Tenant ......................................... LT
Law Enforcement/Public Official Petition ........... LEP
Mechanics Lien ...................................... MECH
Medical Malpractice ................................... MED
Motor Vehicle Tort ...................................... MV
Name Change .............................................. NC
Other General Tort Liability ........................ GTOR
Partition ................................................ PART
Permit, Unconstitutional Grant/Denial by Locality LUC
Petition – (Miscellaneous) ............................ PET
Product Liability ...................................... PROD
Quiet Title ................................................. QT
Referendum Elections ................................ ELEC
Reinstatement (Other than divorce or driving
   privileges) .......................................... REIN
Removal of Case to Federal Court ................... REM
Restore Firearms Rights – Felony ................... RFRF
Restore Firearms Rights – Review .................. RFRR
Separate Maintenance ................................. SEP
Separate Maintenance – Counterclaim/Responsive
   Pleading ............................................ SCRP
Sever Order ............................................ SEVR
Sex Change .............................................. COS
Taxes
   Correct Erroneous State/Local ................... CTAX
   Delinquent ........................................ DTAX
Termination of Mineral Rights ........................ MIN
Trust – Impress/Declare/Create ..................... TRST
Trust – Reformation .................................. REFT
Uniform Foreign Country Money Judgments ...... RFCJ
Unlawful Detainer ....................................... UD
Vehicle Confiscation ................................... VEH
Violation – Election Law ............................... VEL
Voting Rights – Restoration ......................... VOTE
Will Construction ..................................... CNST
Will Contested ......................................... WILL
Writs
   Certiorari ................................................ WC
   Habeas Corpus ....................................... WHC
   Mandamus ............................................. WM
   Prohibition ............................................. WP
   Quo Warranto ...................................... WQW
Wrongful Death .......................................... WD

**EXHIBIT A**

Uploaded: 2023JUL31 16:31 Filed By:SFAIRCLOTH on behalf of Bar# 97439 BNORTH Reference: EF-127216
E-Filed: 2023JUL31 WASHINGTON CC BMCCRACKEN at 2023AUG01 09:17 CL23001531-00

**V I R G I N I A:**

### IN THE CIRCUIT COURT FOR WASHINGTON COUNTY

| | |
|---|---|
| **JOHN DOE,** | |
| Plaintiff, | |
| v. | Case No. _____ |
| | **JURY TRIAL DEMANDED** |
| **EMORY AND HENRY COLLEGE,** c/o Mark R. Graham (registered agent), 30461 Garnand Drive, Emory, Virginia 24327-2500, | |
| Defendant. | |

### COMPLAINT

Plaintiff John Doe[1] was unlawfully disciplined by Emory and Henry College on the basis of a false Title IX report. Accordingly, John Doe brings this civil action against Defendant for violations of Title IX, breach of contract, negligence, and negligence *per se*. For his Complaint against Defendant, John Doe states as follows:

### Parties

1.    John Doe ("Doe") was, at all times relevant to the allegations, an equine studies student at Emory and Henry College.

---

[1] Due to the sensitive nature of the allegations herein, John Doe proceeds pseudonymously pursuant to Va. Code ⁄ 8.01-15.1. His identity is known to all Defendants. If this Court deems it necessary, Doe will move this Court for an order "concerning the propriety of anonymous participation." Va. Code ⁄ 8.01-15.1(A). To likewise protect the identity of his accuser, Doe identifies her by the pseudonym "Jane Roe." Defendant is aware of the identities of each pseudonymous person.

# EXHIBIT A

2.      Emory and Henry College (the "College") is a private higher education institution located in Washington County, Virginia.

## Jurisdiction and Venue

3.      Subject matter jurisdiction is proper in the Commonwealth of Virginia and the Circuit Court of Washington County because the amount in controversy exceeds $25,000.

4.      This Court possesses personal jurisdiction over the College by virtue of its domicile and its transacting business in the Commonwealth. Va. Code ∕ 8.01-328.1(A).

5.      Venue is proper in this Court because all causes of action arose in Washington County, Virginia. Va. Code∕ 8.01-262.

## College's Background

6.      Institutions of higher education are required by law, as interpreted by the United States Supreme Court, to adjudicate claims of sexual harassment under the auspices of Title IX.

7.      Title IX is a federal statute prohibiting discrimination on the basis of sex for all persons in educational institutions that receive federal funding. *See* 20 U.S.C.∕ 1681.

8.      Should the College fail to adequately remedy sexual harassment on campus, it faces liability from alleged victims of sexual assault. These plaintiffs tend to be female.

2

# EXHIBIT A

9.      In April 2011, pressure on the College increased when the Obama Administration's Department of Education published a "Dear Colleague Letter." This guidance, despite not having undergone the formal rulemaking process, demanded that any college receiving federal funding to weaken procedural protections for accused students and faculty. This included limiting the right to a hearing for students and faculty accused of sexual harassment and lowering the burden of proof for these cases to preponderance of the evidence.

10.     The Dear Colleague Letter, and later-issued guidance, publicized statistics of a supposed "rape epidemic" on college campuses targeting female students. These statistics are demonstrably false and debunked.

11.     Further, the author of subsequent guidance enforcing the Dear Colleague Letter, Assistant Secretary for Civil Rights of the Department of Education Catherine Lhamon, resumed her position at the Department of Education as of October 20, 2021, after a party-line confirmation vote in the United States Senate.

12.     Therefore, the College was on notice that a strong and key proponent of the Dear Colleague Letter, who expressed open hostility to male accused students in her confirmation hearings and past writings, was once again in a position to withdraw federal funding from the College if she felt that the College was inadequately "protecting" female students.

13.     Should the U.S. Department of Education see the College as insufficiently protective of alleged female sexual harassment victims, it could withdraw federal funding from the College.

3

**EXHIBIT A**

14.     Thus, the Dear Colleague Letter and U.S. Department of Education incentivized colleges receiving federal funding, including the College, to find male accused students and faculty responsible for the alleged accusations regardless of the weight of the evidence against them.

15.     The College receives federal funding. Withdrawal of federal funding by the U.S. Department of Education would be financially ruinous for the College.

16.     The College was previously sued by alleged female sexual harassment victims and spent significant resources defending those lawsuits.

17.     Therefore, to avoid withdrawal of federal funding, expending more resources defending itself against lawsuit, as well as to avoid significant negative media attention, the College and its employees were incentivized to limit any chance male students, including Doe, had at defending themselves by removing procedural due process protections and to infect the investigation and adjudication with bias against male students on the basis of sex.

18.     In turn, this allowed the College to find Doe, a male accused student, responsible and expel him despite the meager evidence against him.

19.     The Dear Colleague Letter was rescinded in 2017.

20.     The College, however, retained all, or nearly all, of the staff positions the Dear Colleague Letter and its subsequent iterations required. These staff positions included a formal Title IX office and a Title IX Coordinator (the position formally occupied by Ms. Shannon Patterson), both tasked with the enforcement of federal guidance on campus.

4

**EXHIBIT A**

21.     In December 2017, the College secured a $300,000 grant from the U.S. Department of Justice's Office on Violence Against Women. This provided for, among other things, "lecture and interactive programs on topics including … mixed signals, common myths about causes of violence against women, benefits of reporting violence against women crimes, internet safety and programs targeted toward men."

22.     The grant did not provide for any initiatives specifically designed to help male victims of crime, and the College did not pursue initiatives specifically designed to help male victims.

23.     Rather, the College retained student training programs offered by Catharsis Productions.[2] In its programs, Catharsis takes a seemingly comedic approach to the topic of sexual violence and conducts skits designed to model problematic sexual behavior. In its skits, it uses primarily, if not exclusively, examples of male perpetrators and female victims.

24.     In one training posted online for public access on YOUTUBE.COM,[3] Catharsis presenters assert that "it is not just women" who are "taught to live in constant fear" because "queer folks, gender nonconforming folks, trans folks, share

---

[2] The specific content of each presentation offered by Catharsis to the College is unclear, given that Doe has no pre-discovery access to recordings of these specific trainings. It is clear, however, that after reviewing Catharsis's material, the College chose to have at least two trainings. *See* Rachael Wilbur, *E&H holds student awareness program called "The Hook Up,"* EMORY & HENRY COLL. NEWS ARCHIVE (October 25, 2021), https://www.ehc.edu/live/news/2053-eamph-holds-student-awareness-program-called-the.

[3] *Catharsis Sex Signals — Live Web Demo*, YOUTUBE (June 23, 2020), https://www.youtube.com/watch?v=Qn7FrySZ8xY&ab_channel=CatharsisProductions.

**EXHIBIT A**

some of these fears" associated with sexual assault and harassment. Of course, conspicuously absent from this list is men.

25.     In that same training, when one presenter feigns an objection that this approach would paint all "cisgender men" as "bad," the other presenter responds, "I agree with that. No one wants to think that their friend might hurt them, but they might," which appears to concede the objection and warn the audience that their "cisgender male" friends might hurt them.

26.     The College, presumably through Ms. Patterson, also purchased training materials from Peter Lake and from the Association of Title IX Administrators ("ATIXA").

27.     Mr. Lake's training is posted on the College's website.

28.     In it, Mr. Lake repeats several of the erroneous statistics set forth by the Obama Administration's federal guidance, including that "one in five college women experience attempted or completed sexual assault in college; some studies state one in four. One in 16 men are sexually assaulted while in college."

29.     Mr. Lake also lists a statistic that reads "63.3 percent of men at one university who self-reported acts qualifying as rape or attempted rape admitted to committing repeat rapes." Mr. Lake does not discuss any similar perpetration statistics concerning women.

30.     Taking these false statistics together, the effect is to cause a presumption in the reader against the accused male, especially if he is accused of something constituting a perceived pattern.

# EXHIBIT A

31.    The Title IX Office, including Ms. Patterson and all relevant College personnel, received this training.

32.    Ms. Patterson, and presumably all Title IX Office personnel, also received ATIXA training.

33.    Ms. Patterson's email signature indicated, at all relevant times, that she received "Title IX Coordinator special topic certification" from ATIXA and that she is a "Verified Member" of ATIXA.

34.    ATIXA and its founder and manager Brett Sokolow have a history of offering trainings and making comments hostile to accused male students and accused students generally. For example, Mr. Sokolow once criticized advocates for due process as "sticking up for penises everywhere."[4]

35.    Sokolow also publicly advocated for universities to ignore binding federal regulations that granted greater due process protections in universities receiving federal funding.[5]

36.    Consequently, ATIXA and Mr. Sokolow have been roundly criticized by commentators across the political spectrum.[6]

---

[4] Adam Kissel, *Standing Up for Due Process on Campus = "Sticking Up for Penises Everywhere?"*, HUFFINGTON POST (Aug. 30, 2011), https://www.huffpost.com/entry/standing-up-for-due-proce_b_940352.

[5] Brett Sokolow, *Biden is President-Elect. Can We Just Ignore the Title IX Regulations Now?*, JDSUPRA.COM (Nov. 9, 2020), https://www.jdsupra.com/legalnews/biden-is-president-elect-can-we-just-63134/.

[6] Stop Abusive and Violent Environments, *Association of Title IX Administrators*, SAVE.ORG (Mar. 4, 2022), https://www.saveservices.org/more-resources/ (cataloguing criticism).

7

# EXHIBIT A

37.    ATIXA began offering trainings to universities following the Dear Colleague Letter.

38.    All College personnel tasked with the administration of Title IX on campus, including Ms. Patterson, are trained in the College's policy and in Mr. Lake's and ATIXA's training. They are also trained in the general legal requirements of the process, including that Title IX matters must be conducted in a way that does not violate applicable state and federal law.

## Federal Title IX Regulations and College Policy

39.    The U.S. Department of Education promulgated regulations interpreting Title IX, codified at 34 C.F.R. 106, titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance."

40.    The U.S. Department of Education interpreted the effective date to mean that the regulations applied to all reports of sexual harassment (construed broadly to include allegations of sexual assault and other offenses) concerning conduct occurring on or after August 14, 2020.

41.    The federal regulations applied to this matter because, among other things, Jane Roe alleged conduct occurring exclusively in the year 2021.

42.    The federal regulations set forth procedural requirements for the College's adjudication of Title IX matters. Accordingly, the College is required by the regulations to adopt these procedural provisions in its own policies and procedures, for use in student-on-student sexual misconduct complaints.

**EXHIBIT A**

43.    The College adopted the regulations' procedural requirements, as reflected in the College's "Title IX and Sexual Harassment Policy" ("Policy"), which states that the Policy is intended to "meet the College's obligations" under Title IX.

44.    Therefore, the College is not at liberty to substantially alter its Policy without federal regulatory change. Rather, in exchange for federal funding and the payment of tuition by students (without which the College would not exist or be in a position to receive federal funding), the College has agreed to be bound by its regulation-compliant Policy.

### Background of Doe and Jane Roe

45.    Following a brief professional equestrian career, Doe matriculated at the College in the fall of 2021.

46.    Doe paid tuition to the College and agreed to be bound by its policies in exchange for an education and the express or implied promise that the College would abide by its own policies.

47.    Doe and Jane Roe met via Facebook on or around August 22, 2021, and began frequent, daily communication.

48.    This communication quickly became flirtatious, and the two young students, at one point or another, mutually expressed romantic interest in the other.

49.    Roe, an aspiring equestrian, decided to attend the College after asking Doe his opinions of the College on Facebook.

50.    Roe also matriculated at the College in the fall of 2021.

51.    Doe and Roe began casually dating at the end of August 2021.

9

**EXHIBIT A**

52.     By the end of the first week of September, Doe and Roe had engaged in sexual intercourse on multiple occasions and the budding relationship was going well.

53.     Doe and Roe continued to socialize and to communicate with each other through the middle of October 2021. Most of the communication, at least Roe's responses to Doe, occurred over Snapchat.

54.     During this time, Doe was not aware that Roe had a boyfriend.

**Jane Roe's Title IX Complaint**

55.     On or around October 24, 2021, Roe disclosed to Doe that she had been sexually assaulted at a party on campus.

56.     Out of concern for Roe, early the next morning, on October 25th, Doe reported this information to the College's Dean of Students, who forwarded the information to the Title IX Office and Ms. Patterson.

57.     Doe did not ask Roe's permission to provide the information to the Dean.

58.     That same day, Ms. Patterson contacted Roe to receive more information about the assault.

59.     When Roe was contacted by Ms. Patterson, she became enraged that Doe had reported her assault. She denied that she had ever told Doe of her assault, denied that she was ever assaulted, and embarked on a harassment campaign against Doe.

60.     During the meeting with Ms. Patterson, Roe falsely stated that Doe had a gun in his horse trailer at the equestrian center.

61.     On the basis of Roe's false statement, immediately accepted as true by Ms. Patterson, Ms. Patterson convened the "Behavioral Intervention Team" at the

**EXHIBIT A**

College, which decided together with Ms. Patterson that Doe would be investigated for stalking.

62.     Ms. Patterson and the Behavioral Intervention Team directed the campus police to search Doe's trailer for the gun. The search was to take place on November 1, 2021.

63.     The College's campus police are duly authorized law enforcement officers of the Commonwealth.

64.     Doe consented to the search and no gun was found.

65.     In the meantime, Roe continued her harassment campaign. She enlisted her boyfriend to contact Doe via Facebook.

66.     Roe's boyfriend contacted Doe on October 25, 2021, stating, among other things, that he was planning to attend Roe's classes with her from now on and that he "will be making her file a restraining order." These text messages were provided to the College.

67.     Around the same time, an unknown individual texted Doe to "leave [Roe] alone." The most likely explanation for this text is that Roe distributed Doe's contact information.

68.     Doe reported this information to the College's police department on October 25, 2021.

69.     The following day, after speaking with Ms. Patterson, Roe contacted campus police and formally reported Doe for stalking and sexual assault. This was a false report. Roe was referred back to Ms. Patterson.

**EXHIBIT A**

70.    When the Behavioral Intervention Team decided to investigate Doe for stalking, it decided not to investigate him for sexual assault.

71.    A mutual "no contact order" was put in place by Ms. Patterson between Doe and Roe on October 27, 2021. The "no contact order" prohibited the parties from contacting each other directly or indirectly through third parties.

72.    On or around November 5, 2021, Roe texted Ms. Patterson to report an alleged violation of the "no contact order." Roe stated that Doe drove "slowly" around a parking lot close to her dorm. In actuality, Doe had dropped off a friend and subsequently drove home.

73.    Ms. Patterson instructed Roe to contact campus police. Roe contacted campus police, who escorted her to the campus police station. Once at the police station, Roe told the campus police officers that Doe had a gun and horse tranquilizers in his dorm room. At the time Roe made this report, she knew that Doe was permitted to own horse tranquilizers.

74.    Operating on this information, police searched Doe's dorm room —this time without securing Doe's consent or seeking a search warrant —and found no gun. They did find and confiscate horse tranquilizers, which were later determined to be lawfully issued to Doe at the direction of a veterinarian.

75.    Roe, having had no personal contact with Doe since the involvement of the Title IX Office, had no basis for her accusation that Doe was actively in possession of a gun on campus.

**EXHIBIT A**

76.    Despite Roe having falsely reported the possession of a firearm to the College's police force on two separate occasions, the College decided to move forward with a formal Title IX investigation but only with respect to stalking.

77.    The College did not discipline Roe for her false reports.

### The College Conducts its Cursory Investigation

78.    On November 8, 2021, Ms. Patterson issued Doe a Notice of Allegations, beginning the formal Title IX investigation and adjudication process at the College, per College Policy and federal law.

79.    According to federal regulation, a Notice of Allegations must, among other things, "include the identities of the parties involved in the incident, if known, [and] the conduct allegedly constituting sexual harassment under∕ 106.30,[7] and the date and location of the alleged incident, if known." 34 C.F.R. ∕ 106.45(b)(2)(B).

80.    Further, "the written notice must inform the parties that they may have an advisor of their choice, who may be, but is not required to be, an attorney, under paragraph (b)(5)(iv) of this section, and may inspect and review evidence under paragraph (b)(5)(vi) of this section." *Id.*

81.    A Notice of Allegations must also "inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process." *Id.*

---

[7] "Sexual harassment" as defined by ∕ 106.30 is expansive and would encompass a stalking charge.

**EXHIBIT A**

82.    The federal government's purpose in drafting ∕ 106.45(b)(2) was that "[f]undamental fairness and due process principles require that a respondent knows the details of the allegations made against the respondent, to the extent the details are known, to provide adequate opportunity for the respondent to respond."[8]

83.    The College's Policy restates the minimal requirements of 34 C.F.R. ∕ 106.45(b)(2)(B) and adds additional requirements. For example, the Policy states that it will also inform students that both false statements and retaliation are prohibited and how to report retaliation.

84.    The College defines "retaliation" as "any adverse action or threat taken or made against an individual, including through third parties and/or legal counsel, for making a report of prohibited conduct or participating in any investigation or proceeding related to this policy. (Applies to both parties)."

85.    The Notice of Allegations issued to Doe on November 8, 2021, failed to list (1) the conduct allegedly constituting sexual harassment under 34 C.F.R. ∕ 106.30; (2) the date and time of the alleged conduct violation; (3) the right to an advisor who may be an attorney and who may inspect and review evidence; (4) the prohibition on false statements and retaliation; and (5) the procedure for reporting retaliation.

86.    Rather, the Notice of Allegations to Doe and Roe merely "advised against" the use of false statements.

---

[8] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30133 (May 19, 2020).

# EXHIBIT A

87.     Further, instead of including a "date and time" of the alleged violation, the Notice of Allegations simply stated that the "alleged incidents occurred throughout the fall 2021 semester at Emory & Henry College."

88.     This minimal detail did not allow Doe to meaningfully prepare a defense as he was unclear on what specific conduct formed the basis of any policy violation.

89.     The federal regulations also set forth a separate requirement that the College must provide notice of the "grievance process" when issuing Notices of Allegations. 34 C.F.R. ∕ 106.45(b)(2)(A). This requires the College to issue a copy of the Policy separate from its ∕ 106.45(b)(2)(B) obligations.

90.     The College simply attached a copy of its thirty-two-page Policy to the Notice of Allegations.

91.     Ms. Patterson, as the Title IX Coordinator and the signatory to the Notice of Allegations, was responsible for these errors.

92.     College Policy and federal law afford Doe the right to be presumed "not responsible" throughout the investigation and adjudication.

93.     Further, the regulations require the College to adopt the definition of "stalking" set forth in 34 U.S.C. ∕ 12291(a)(30). 34 C.F.R. ∕ 106.30.

94.     Therefore, the College defined stalking as "a course of conduct directed at a specific person that would cause a reasonable person to (1) fear for his/her/their safety or the safety of others, or (2) suffer substantial emotional distress."

**EXHIBIT A**

95.    College Policy and federal law require that Title IX investigations be conducted in an impartial and unbiased manner and requires only the inclusion of evidence "directly related" to the allegations.

96.    Ms. Patterson appointed herself as one of two Title IX investigators to investigate Roe's complaint. The other investigator was Fred George.

97.    Ms. Patterson appointed Doe an advisor on November 11, 2021, and encouraged Doe to meet with his advisor about his case.

98.    Unknown to Doe, Doe's advisor would sometimes forward his communications with Doe to Ms. Patterson, meaning that his Advisor was sharing information with an investigator without his Advisee's knowledge or consent.

99.    On or around November 10, 2021, Doe contacted Ms. Patterson and complained about Roe circulating rumors and false allegations against him. These rumors were a result of Doe's Title IX report and were retaliation according to College Policy.

100.    Ms. Patterson never investigated Roe for retaliation or took any substantive action as a result of Doe's complaint, despite the Policy's provision that "only a report to the Title IX Coordinator or an Official with Authority will trigger the College's obligation to respond to an allegation of Title IX Sexual Harassment."[9]

101.    Ms. Patterson and the other investigator, Mr. George, interviewed Roe on November 15, 2021.

_____

[9] As explained above, "sexual harassment" in this context is construed broadly and it would encompass a retaliation charge under the College Policy.

**EXHIBIT A**

102.    During the interview, neither investigator asked Roe about whether she took any adverse actions against Doe since his filing of the original Title IX report, including but not limited to filing false police reports or spreading rumors about Doe.

103.    During the interview, among other things, Roe admitted that she had, in fact, been assaulted in the past. Roe also falsely stated that she had "turned down" Doe's romantic interest at the beginning of their interactions and had not engaged him romantically since. Contrary to this statement, in the same interview, Roe described a story in which she went over to Doe's dorm room, and Doe "came onto her." Roe stated that "she didn't want anything to do with that," and that "halfway through" Doe left to go get a condom from another student. Roe also implied that she intentionally avoided Doe whenever possible, following the beginning of September 2021. This was provably false. Roe also falsely alleged that Doe had sexually assaulted another female student.

104.    Despite this new and conflicting information, neither Ms. Patterson nor Mr. George asked Roe follow up questions relating to this information.

105.    The investigators also failed to ask Roe follow up questions relating to her new allegation that Doe had sexually assaulted another student.

106.    At some point in the investigation process, Roe submitted various screenshots of text and Facebook messages between herself and Doe, appearing to show repeated communications from Doe to which Roe never responded. These messages were not contiguous, meaning that it appeared on their face that Roe had selectively submitted these messages and omitted some of Roe's responses.

# EXHIBIT A

107.   While it was never made clear what *exactly* formed the basis of the stalking charge, these messages were the majority of the meager evidence submitted against Doe. Neither investigator, however, requested the complete file of messages.

108.   Ms. Patterson and Mr. George interviewed Doe on November 17, 2021.

109.   During Doe's interview, Doe explained the details of his relationship with Roe. He explained that he and Roe would kiss, hold hands, go to dinner, and otherwise be romantic with each other. Further, Doe admitted to lawfully storing a gun in his trailer or truck, for emergency horse euthanasia purposes. Doe admitted to lawfully possessing horse tranquilizers and taking care to store the tranquilizers properly to avoid theft.

110.   During Doe's interview, Doe also explained the circumstances surrounding his Title IX report to the College. He explained that he and Roe were socializing the night of October 24, 2021, and Doe confronted Roe about her newfound habit of heavy alcohol consumption. Doe expressed concern for Roe that if she continued this behavior, she may find herself in a dangerous situation. Roe responded that "it technically already happened but in a nicer way." Doe asked what Roe meant by this statement, and Roe explained that "[she] was plastered drunk one day and some guy took [her] home and [she] couldn't walk." Doe replied that he needed to report this information to Title IX and Roe begged him to not make the report. Doe replied that, due to his morals, "[he] need[s] to report this."

111.   Doe also explained that it was typical for him to text Roe and for her to respond to his text on Snapchat. He explained that he and Roe would occasionally

18

**EXHIBIT A**

call over Snapchat rather than by phone. He also explained that they shared one longer Snapchat call in late October 2021, wherein Roe discussed with Doe her thoughts about changing career paths.

112.    Since Roe would habitually respond to Doe over Snapchat instead of by text message, the text message record appeared (falsely) to show that Doe was only contacting Roe with no response. The Snapchat record, therefore, would have impeached Roe's allegation of stalking because the two had reciprocal communication.

113.    Neither Ms. Patterson nor Mr. George followed up with Roe concerning this information; similarly, neither Ms. Patterson nor Mr. George attempted to retrieve this information from Snapchat.

114.    Doe reiterated during his interview that he and Roe continued to socialize until late October 2021. Doe recounted one occasion where Roe asked him to pick her up, and when he did so, Roe was intoxicated. This impeaches Roe regarding her contention that she avoided Doe whenever possible after the beginning of September 2021. Neither Ms. Patterson nor Mr. George followed up with Roe about this information.

115.    Further, Doe responded to Roe's accusation that "[Roe] didn't want anything to do with" sexual intimacy with him. Doe explained the circumstances of the sexual encounter that Roe referenced (one of the many sexual encounters between the two students), wherein Doe asked another student for a condom. Doe explained that he and Roe began engaging sexually and that Roe had asked Doe if he had a

19

# EXHIBIT A

condom. Because he did not, he asked another student for a condom. Once the condom was obtained, they had consensual sexual intercourse. Doe explained that Roe stayed in the room "for a while following the intercourse."

116.    College Policy and 34 C.F.R. 106.45(b)(5)(i) "ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the [College] and not on the parties." In other words, the College and Ms. Patterson were charged by law to gather relevant evidence.

117.    In failing to follow up with Roe or Snapchat regarding Doe's information, Ms. Patterson knowingly failed to fulfill her responsibility under College Policy and federal law.

118.    On or around November 18, 2021, Doe complained again to Ms. Patterson about Roe's rumors. Again, Ms. Patterson took no action to remedy the issue.

119.    The next day, Doe complained to his advisor about the rumors, who forwarded the complaint to Ms. Patterson, who, again, took no action.

120.    On November 29, 2021, Ms. Patterson and Mr. George continued their investigation and interviewed the student who provided the condom. The witness was biased against Doe, having spoken with Roe repeatedly about the matter, but ultimately affirmed Doe's version of events and impeached Roe's.

121.    Specifically, the witness stated that when Doe asked her for a condom, she was unaware of "what was really going on," which meant that the witness did not notice anything wrong at the time she gave Doe the condom. The witness also stated

**EXHIBIT A**

that Roe had denied ever engaging in sexual intercourse with Doe in order to counteract Doe telling students he had slept with Roe.

122.   About two weeks later, on December 13, 2021, Ms. Patterson and Mr. George published a Final Investigative Report.

123.   In the Report, Ms. Patterson included a "Conclusion" section, which stated that "Based on the totality of the circumstances and the information obtained pursuant to this investigation, and based on a more likely than not standard of proof, the investigators conclude that the case warrants a formal Title IX hearing."

124.   In reality, Ms. Patterson had no discretion to determine whether "the case warrants a formal Title IX hearing." The federal regulations require mandatory live hearings to resolve formal Title IX complaints. 34 C.F.R. ⁄ 106.45(b)(6).

125.   Ms. Patterson's "conclusion" served only to prejudice Doe in front of the Hearing Panel, which would make an ultimate decision in the matter.

126.   In preparation for the hearing, Doe attempted to prepare with his College-appointed advisor, who did not respond until one day before the hearing.

**The Biased Hearing**

127.   Per its Policy, the College convened a Hearing Panel, which was composed of two women and one man.

128.   The hearing was held virtually on January 6, 2022.

129.   None of the parties' or witnesses' statements are made under oath at any point in the College process.

130.   Ms. Patterson attended the hearing as the Title IX Coordinator.

**EXHIBIT A**

131.    Doe and Roe attended the hearing with their advisors.

132.    The one witness who was interviewed during the investigation attended the hearing for the time in which she testified.

133.    Doe and Roe testified during the hearing and answered all questions posed to them.

134.    As stated above, Doe was at all times entitled to a presumption of innocence. Instead of stating this presumption at the outset of the hearing, the Hearing Panel chair asked Doe if he "accepted responsibility" for the charge of stalking.

135.    Roe conceded during the hearing that she did, in fact, have a sexual relationship with Doe that included holding hands, kissing, and sexual intercourse. Roe stated for the first time explicitly that she did not consent to either kissing or sexual intercourse with Doe on any occasion.

136.    Roe also testified that the gun and tranquilizers was "one of the first things" Doe talked about, and that this information made Roe very uncomfortable and frightened. Even if true, this information impeaches Roe's credibility because it raises the (unasked and unanswered) question of why she voluntarily socialized with Doe for months following the allegedly "frightening" conversation.

137.    During Doe's testimony, the Hearing Panel asked Doe, among other things, whether he had spoken to any other person at the College about the case since the imposition of the no contact order, implying that if Doe were to do so, he would have violated the no contact order. The Hearing Panel did not ask any similar

**EXHIBIT A**

question of Roe, despite Doe's clear allegations and evidence of Roe spreading rumors about him around campus.

138.    Doe's advisor conducted an ineffective cross-examination of Roe and the witness. Doe's advisor lacked any formal training and could not conduct effective cross-examinations. Doe's advisor did not ask Roe, among other things, about Snapchat, her contradictory statements regarding what sexual intercourse she consented to, if any, or about the false police reports she made.

139.    Despite Roe's credibility issues, the Hearing Panel found Doe "responsible" for Roe's allegations of stalking.

140.    The Hearing Panel rendered its decision on or around January 10, 2022, four days after the hearing. The decision stated that Doe met the stalking standard, restated the stalking definition, and gave a basis for the decision in the same paragraph.

141.    The Hearing Panel's apparent basis for its decision was that "[b]y the respondent's own words he would continue this type of behavior even if asked to cease communication if he felt a person was making the wrong choices for themselves. Additionally, the respondent violated the no contact order that was put in place on November 9, 2021."

142.    The Hearing Panel's stated basis does not pass muster for several reasons and is otherwise incongruent.

# EXHIBIT A

143. First, the College found Doe responsible for violating a no contact order, but it never previously charged Doe with that violation. The decision also misstated the date on which the no contact order was issued.

144. Second, the decision is vague and misstates Doe's testimony. Doe testified in the hearing that if he felt a friend needed help, he would step in to try to help. He did not testify that he would harass anyone or do anything against anyone's will and certainly did not admit to stalking.

145. Third, the Hearing Panel (consistent with the College's failures up to this point) failed to list what behavior violated the policy. The only mention of specific behavior in the entire decision was the phrase "this type of behavior" in the basis for the decision. The decision never explains to what "this type of behavior" refers.

146. College Policy requires that a Hearing Panel determine whether the respondent (here, Doe) "engaged in the alleged conduct" before he is found responsible. The Hearing Panel noted no such finding in its decision.

147. In fact, the Hearing Panel decision included no discussion of the facts of the case.

148. Insofar as "this type of behavior" refers to the kind of communication reflected in Roe's submitted messages, the Hearing Panel failed to so state and failed to question her about whether these messages were complete. Further, the decision did not apply the facts to the definition of stalking and no behavior rose to the level of stalking under the school policy.

# EXHIBIT A

149.    The decision erroneously listed the bases for appeal as "limited to allegations that the decision violates Procedural or Substantive Standards." The phrase "Procedural or Substantive Standards" —though capitalized —never appears in the Policy.

150.    The actual bases for appeal in the Policy are: "New information not reasonably available at the time of the decision/hearing that could affect the outcome of the matter; The Title IX Coordinator, investigator, or Hearing Officer(s) had a conflict of interest or bias for or against complainants or respondents generally or the individual Complainant or Respondent specifically that affected the outcome of the matter; and Procedural error(s) that affected the outcome of the matter."

151.    The Hearing Panel decision included a paragraph stating that Virginia law requires a prominent transcript notation. This statement reflects, and was compelled by, Va. Code/23.1-900.

152.    Doe's transcript was marked according to Va. Code/23.1-900; however, the transcript notation erroneously reads that Doe was "dismissed" rather than suspended.

153.    Any reasonable person reviewing Doe's transcript would understand the transcript notation to mean that Doe was expelled from the College, which is not accurate.

154.    As a sanction, the Hearing Panel suspended Doe for over three years, terminated his housing contract, barred him from campus, and barred him from ever living on campus again even if he is readmitted. Further, since Doe disclosed his

**EXHIBIT A**

anxiety disorder during the hearing, the Hearing Panel required that Doe receive treatment for his anxiety before reapplying.

155.    When the College suspended Doe, it required him to turn in his keys to his on-campus apartment by the close of business on January 12, 2022, only two days later. Doe did so.

156.    Due to unrelated scheduling conflicts, Doe was unable to move all of his belongings out of his apartment before he was required to turn in his keys. Therefore, Doe arranged with Dean of Students, Tracey Wright, to have Doe's father and Doe's friend move his belongings out of his apartment on the following day, January 13, 2022.

157.    The next day, on January 13, Doe's father and friend moved Doe's belongings out of his apartment. Throughout the move, Ms. Wright supervised.

158.    At no point was Doe on campus on January 13, 2022. Nevertheless, following the move, Ms. Wright sent an email to Doe directly. The email stated that he was on campus on January 13, 2022, and that he would be arrested if he set foot on campus again. This caused severe emotional distress to Doe.

159.    In preparation for his appeal of the Title IX decision at the College, Doe discovered that he was able to "un-archive" his Facebook messages and was able to review them in their entirety for the first time.

160.    These messages showed, among other things, that Roe had indeed been romantically interested and involved with Doe.

# EXHIBIT A

161.   For example, she had messaged Doe, "I like you... more than I am willing to admit... don't get a big ego about that."

162.   She also had sent a meme to Doe containing a "virtual hug" with a heart.

163.   Further, when Doe discussed being "with Megan," in reference to another female student who may have had an interest in Doe, Roe wrote "is she gonna murder me," the inference being that Doe and Roe were romantically involved.

164.   Finally, on this same topic, Roe wrote, "Well I would hope if you did replace me it wouldn't be with some fat ugly girl," which shows directly that Roe thought she was romantically involved with Doe.

165.   Doe submitted a timely appeal under all three of the bases set forth in the Policy and included copies of the above referenced text messages. Doe offered that the full set of messages could be provided upon request.

166.   Without forwarding Doe's appeal to an "Appellate decision-maker," the College summarily denied Doe's appeal on January 27, 2022.

## Impact on Doe

167.   As a result of the College's wrongful finding, Doe suffers severe emotional, psychological, and financial harm.

168.   Doe suffers from insomnia, rendering him unable to sleep for long periods of time, which has detrimental effects on his mental health generally.

169.   Doe also suffers emotionally from being unable to visit his friends on campus, due to the no trespass order imposed by the College.

# EXHIBIT A

170.    Doe's financial present and future are harmed due to not being on track to graduate from college at the time in which he was supposed to graduate, thus resulting in lost potential earnings.

171.    Having the mark on his transcript as well as his overall record from the College will also prevent him from gaining admittance to other colleges and universities.

172.    Having the mark on his transcript as well as his overall record from the College will also limit his job prospects in the future.

173.    Further, from inception, the Title IX process itself caused Doe harm. Doe suffered academic harm resulting from his inability to attend classes due to extreme stress, resulting in Doe failing three of his five classes during the fall 2021 semester.

174.    With this finding on Doe's record and transcript, he is effectively barred from future education and employment requiring an education records check.

## CAUSES OF ACTION

### COUNT I:
### Violation of Title IX

175.    Doe incorporates the above paragraphs by reference.

176.    Doe was a "person" at the College, entitling him to rights under Title IX. 20 U.S.C.// 1681 *et seq.*

177.    The College receives federal funding.

28

# EXHIBIT A

178.   The College discriminated against Doe on the basis of sex by granting preferential treatment to his female accuser throughout the investigation and adjudication of her claim and manifesting prejudice against Doe as a male.

179.   The College was motivated by pressure from the Department of Education and by its own ideological biases to find male students responsible and discipline them.

180.   The College exhibited anti-male bias against Doe by: (1) immediately believing the female complainant's statements, even when contradicted by evidence or inconsistency; (2) misstating Doe's testimony; (3) including irrelevant character evidence against Doe and excluding or not investigating relevant impeachment evidence against the female complainant; (4) selecting training materials that were specifically biased against men; (5) finding Doe responsible for stalking without ever informing Doe of what conduct, if true, would support a stalking finding; (6) repeatedly misstating or obscuring College Policy and violating federal regulations; (7) summarily dismissing his appeal despite new evidence that corroborated Doe's account; and (8) refusing to act on Doe's multiple complaints against Roe. This is a non-exhaustive list of Defendants' anti-male bias shown in this case.

181.   The College's decision to discipline Doe and issue severe sanctions against him was motivated and caused by its bias against him on the basis of his male sex.

182.   There is no legitimate, nondiscriminatory reason for the College's behavior.

29

**EXHIBIT A**

183.   Even if a legitimate, nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

184.   Doe has suffered severe professional, economic, and psychological harm as a result of this discriminatory process orchestrated against him. Therefore, Doe requests compensatory damages, declaratory relief in the form of a declaration stating the College unlawfully discriminated against him on the basis of his sex, injunctive relief clearing his disciplinary record at the College, and any other relief the Court deems just and proper.

## COUNT II:
### Violation of Title IX —Deliberate Indifference

185.   Doe incorporates the above paragraphs by reference.

186.   Title IX prohibits all discrimination on the basis of sex in education.

187.   This prohibition includes discrimination that takes the form of deliberate indifference to student-on-student sexual harassment.

188.   Deliberate indifference sexual harassment includes four elements: (1) that the educational institution receives federal funds; (2) that the plaintiff was subjected to harassment based on [his] sex; (3) that the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity; and (4) that there is a basis for imputing liability to the institution.

189.   The University receives federal funds.

**EXHIBIT A**

190.    By spreading rumors around campus that Doe had committed sexual assault or stalking, Roe subjected Doe to harassment on the basis of his sex.

191.    The harassment has been sufficiently severe and pervasive in that it resulted in the loss of educational benefits in the form of Doe's failing of three classes due to the harassment he suffered at the hands of Roe and her accomplices.

192.    There is a basis to impute liability to the University because the University had actual knowledge of the harassment and acted clearly unreasonably in light of the known circumstances.

193.    The University failed to act in a manner reasonably calculated to end the harassment, as required by law.

194.    Among the many options, the University could have advised Roe to cease her retaliation and harassment; it could have developed policies to prevent this type of harassment; and it could have publicly discouraged and denounced this type of harassment. Instead, it took no action to protect Doe.

195.    As a direct result of the University's deliberate indifference to the harassment he endured, Doe suffered and continues to suffer damages.

**COUNT III:**
**Violation of the Title IX - Retaliation**

196.    Doe incorporates the above paragraphs by reference.

197.    The College is subject to Title IX.

198.    Title IX provides for a cause of action for retaliation.

# EXHIBIT A

199.   In filing a report of sexual assault, Doe engaged in activity protected by Title IX.

200.   As a result of Doe's filing of a report of sexual assault, Doe suffered adverse actions attributable to the College, including but not limited to the prosecution of a false Title IX complaint against him.

201.   The College had a retaliatory motive in taking adverse actions against Doe, evidenced by, among other things, its violation of its own policies to suit Roe and harm Doe, and its hostility towards Doe throughout the Title IX adjudication.

202.   Doe suffered severe professional, economic, and psychological harm as a result of this retaliatory process orchestrated against him. Therefore, Doe requests compensatory damages, declaratory relief in the form of a declaration stating the College unlawfully retaliated against him on the basis of his sex, injunctive relief clearing his disciplinary record at the College, and any other relief the Court deems just and proper.

## COUNT IV
### Breach of Contract

203.   Doe incorporates the above paragraphs by reference.

204.   In accepting the College's offer of enrollment, Doe accepted the College's offer to enter into a contractual relationship wherein Doe paid tuition in exchange for an education.

205.   The parties agreed, expressly or impliedly, to abide by policies and procedures of the College.

**EXHIBIT A**

206. The applicable College Policy may not be changed solely at the discretion of the College; rather, the College is bound to follow its policy absent federal intervention.

207. The College breached its contract with Doe when it breached its own policies and procedures in its adjudication of the complaint against Doe.

208. Specifically, the College breached its contract when it (1) failed to issue an adequate Notice of Allegations; (2) failed to inform Doe that he may hire an attorney as his advisor; (3) failed to gather and consider relevant evidence; and (4) failed to enforce the presumption of non-responsibility.

209. As a result of the College's breach, Doe has suffered substantial financial harm. Accordingly, Doe requests compensatory and incidental damages.

<u>COUNT V</u>
Negligence *Per Se*

210. Doe incorporates the above paragraphs by reference.

211. The United States Department of Education promulgated regulations interpreting Title IX, codified at 34 C.F.R. 106, titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance."

212. 34 C.F.R. 106 is a binding regulation on the College.

213. 34 C.F.R. 106 was enacted for public safety. Specifically, the regulations were designed to both protect student-victims of sexual harassment and to protect students accused of sexual harassment.

# EXHIBIT A

214.    Doe, as a student, belongs to the class of persons the regulations were designed to protect.

215.    The College's violations of 34 C.F.R. 106 were a proximate cause of the injury to Doe, because the violations produced the harm to Doe and no efficient intervening cause exists that would have caused the harm to Doe.

216.    As a result of the College's breach of 34 C.F.R. 106, Doe suffers and continues to suffer substantial financial harm. Accordingly, Doe requests compensatory, incidental, and emotional damages. Doe also requests injunctive relief clearing his disciplinary record at the College, and any other relief the Court deems just and proper.

## COUNT VI
### Negligence

217.    Doe incorporates the above paragraphs by reference.

218.    In choosing to adjudicate matters of sexual misconduct, the College assumed a duty to conduct its sexual misconduct proceedings with reasonable care under the circumstances, to avoid foreseeable harm to students subject to its procedures.

219.    It was foreseeable that Doe would be harmed by maladministration of the College's Title IX procedures.

220.    The College breached its duty to Doe when it subjected him to the Title IX process and failed to abide by its own procedures, and otherwise conducted itself in a biased or partial manner.

**EXHIBIT A**

221.   The College's action was a proximate cause of Doe's injury, because Doe's injury would not have occurred absent the College's action, and because no efficient intervening cause exists that would have caused the harm to Doe.

222.   As a result of the College's breach of its duty, Doe suffers and continues to suffer substantial financial harm. Accordingly, Doe requests compensatory, incidental, and emotional damages. Doe also requests injunctive relief clearing his disciplinary record at the College, and any other relief the Court deems just and proper.

**JURY DEMAND**

223.   Doe demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE Doe respectfully requests that this Court grant him the following relief against all Defendants:

1.   Damages in the amount to be proved at trial;

2.   Costs of suit;

3.   Attorneys' fees, pursuant to 42 U.S.C./ 1988(b);

4.   Injunctive relief as delineated above; and

5.   Such other and further relief as the Court deems necessary and proper.

Dated:  July 31, 2023                       John Doe
                                            By Counsel

                                            BINNALL LAW GROUP, PLLC

35

**EXHIBIT A**

Benjamin North, VSB No. 97439
Lindsay R. McKasson, VSB No. 96074
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: ben@binnall.com
        lindsay@binnall.com

*Counsel for Plaintiff John Doe*

36